UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

SHANE SINNOTT,

                    Plaintiff,

        v.

MR. SMITH, MR. COOPER, DR. DWIGHT
D. LEWIS, NURSE ADMINISTRATOR BECK,
NURSE COOK,

                    Defendants.

───────────────────────────────

**DECISION AND ORDER**

6:21-CV-06197 EAW

## **INTRODUCTION**

*Pro se* plaintiff Shane Sinnott ("Plaintiff") brings this action under 42 U.S.C. § 1983, asserting claims that arose while he was incarcerated at Orleans Correctional Facility ("Orleans") against defendants Mr. Jeremy Smith ("Smith"), Mr. Gary Cooper ("Cooper"), Dr. Dwight D. Lewis ("Lewis"), Nurse Administrator Beck ("Beck"), and Nurse Cook ("Cook") (collectively Defendants).[1]  Pending before the Court is Defendants' motion for summary judgment, to which Plaintiff has filed no opposition.  (Dkt. 30).  For the reasons that follow, Defendants' motion is granted.

───────────────

[1]     Defendants' full names are taken from the transcript of the Court of Claims trial involving Plaintiff, Cooper, Lewis, and Smith.  (*See* Dkt. 30-2 at 113 (Cooper), 138 (Lewis), 184 (Smith)).

**FACTUAL BACKGROUND**

Plaintiff failed to file a response to Defendants' Statement of Undisputed Facts (Dkt. 30-5), which was submitted in accordance with Local Rule of Civil Procedure 56. Plaintiff was warned by the Court that if he failed to file the required response, "all material facts set forth in Defendants' statement of material facts not in dispute will be deemed admitted." (Dkt. 31 at 2). Accordingly, the Court treats the material facts set forth in Defendants' Statement of Undisputed Facts as true to the extent they are supported by the record. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). Considering Plaintiff's *pro se* status, the Court in its discretion has conducted an independent review of the record to ascertain whether disputes of material fact exist that would preclude summary judgment in favor of Defendants. *See Daley v. Cablevision Sys. Corp.*, No. 12-cv-6316 (NSR), 2016 WL 880203, at *1 (S.D.N.Y. Mar. 7, 2016), *aff'd*, 675 F. App'x 97 (2d Cir. 2017). When a court independently reviews the record, "any verified complaint filed by the plaintiff should be treated as an affidavit" on a motion for summary judgment. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 209-10 (N.D.N.Y. 2008) (citing *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) and citations omitted); *see Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.1 (S.D.N.Y. 2019) (a "verified complaint is to be treated as an affidavit for summary judgment purposes") (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds by Whitfield v. City of N.Y.*, 96 F.4th 504 (2d Cir. 2024) and citations omitted).[2] The Court specifically notes that the record includes a

---

[2]    Plaintiff signed and filed his verified amended complaint under penalty of perjury. (Dkt. 9 at 10).

transcript and exhibits from a New York State Court of Claims trial, *Shane Sinnott v. The State of New York*, held on May 25, 2023, in front of Judge Debra A. Martin, in which Plaintiff brought claims arising from the same series of events. (Dkt. 30-2 at 68-208; Dkt. 30-3).

On December 4, 2019, Plaintiff was working in maintenance while incarcerated at Orleans. (Dkt. 30-2 at 74:9-12, 91:7-15; Dkt. 30-5 at ¶ 9). He normally worked as a locksmith, but when there was a shortage of projects, he would be assigned tasks in other areas. (Dkt. 30-2 at 74:18-24). Smith was a Department of Corrections and Community Supervision ("DOCCS") maintenance supervisor at Orleans whose responsibilities included assigning work to incarcerated staff and civilian staff, processing work orders, and managing construction projects. (*Id.* at 185:10-20). Cooper, a DOCCS employee at Orleans under whom Plaintiff worked, tasked Plaintiff and another inmate with repairing a motor for a ceiling fan. (*Id.* at 74:18-75:11, 118:10-12). Plaintiff testified that Cooper tended to be irritated by the other inmate based on their past history and that Cooper was also aggravated that it had taken Plaintiff and the other inmate longer than expected to repair the motor. (*Id.* at 75:15-20, 84:19-85:1).

When Plaintiff and the other inmate informed Cooper that they had fixed the motor, Cooper instructed them to test the motor to ensure that it rotated properly. (Dkt. 30-2 at 75:25-76:2, 93:12-14; *see* Dkt. 30-5 at ¶ 20). To test a motor, the maintenance staff generally used a device (the "testing device") to connect the motor to a power source. (Dkt. 30-2 at 118:22-119:5, 191:3-16; Dkt. 30-5 at ¶ 24). The testing device, which resembled a power cord, contained an electrical outlet at one end of the cord and a series of three

- 3 -

electrical leads at the other end of the cord.  (*See* Dkt. 30-2 at 119:19-121:25; Dkt. 30-3 at 302-04, 340-42).  The electrical leads had metal clips that a person attaches to prongs in the motor.  (*See id.*).  When the testing device was attached to the motor and plugged into a power source, a complete electrical circuit was created, allowing the motor to run.  (*See id.*).  In other words, the testing device allowed the maintenance staff to simulate how the motor would rotate once powered.  The electrical leads were not supposed to touch one another because doing so could create a short and blow the motor.  (*Id.* at 123:21-24).

Cooper told Plaintiff to attach the testing device's electrical leads to the motor without allowing the metal clips on the leads to touch.  (*Id.* at 78:11-16, 82:14-22, 123:16-20).  Plaintiff alleges that he told Cooper that the device was held together by duct tape and did not look "right," and that Cooper replied, "it's fine, just don't let the ends touch."  (Dkt. 9 at 6).  Cooper thought that Plaintiff knew to hold the plastic coating on the clips, rather than the clips themselves.  (Dkt. 30-2 at 131:6-21; Dkt. 30-5 at ¶ 21).  Plaintiff testified that Cooper, who was standing next to Plaintiff, did not look at Plaintiff's hands to ensure they were not on the clips.  (Dkt. 30-2 at 78:17-25, 82:25-83:8).  Cooper and Plaintiff communicated to each other that Plaintiff was ready for Cooper to turn the power on to test the motor, and Cooper did so.  (*Id.* at 82:25-83:18, 124:12-17, 129:17-130:1; Dkt. 30-5 at ¶ 22).  Since his hands were on the metal clips, Plaintiff received an electrical shock and fell down, as he felt the electricity go through his body for approximately five to eight seconds.  (Dkt. 30-2 at 78:17-25, 85:12-86:6, 94:5-12).  Plaintiff described that he felt "real bad tingling burning" and that "[i]t went through both my arms up to my head and just straight through my whole body[,] and . . . everything was tight in my chest got tight and

- 4 -

kind of like it tensed my muscles . . . ." (*Id.* at 85:22-86:5). Plaintiff yelled and Cooper cut the power supply. (*Id.* at 79:3-24, 125:4-6, 132:16-18). Smith, who had been in his office approximately 30 feet away when the incident occurred, ran over to Plaintiff and asked what happened, and Plaintiff said that he had been electrocuted but was okay. (*Id.* at 80:1-9, 98:21-24, 126:2-5; 191:17-22, 192:6-12; Dkt. 30-5 at ¶¶ 26-27).

Cooper accompanied Plaintiff to get an immediate medical evaluation. (Dkt. 30-2 at 80:9-13, 86:9-16, 99:3-11, 126:2-13). A nurse at Orleans evaluated Plaintiff's vitals and noted that he was alert, oriented, and offered no complaints, and he underwent an electrocardiogram (EKG). (*Id.* at 80:11-17, 141:23-142:5; Dkt. 30-3 at 42; Dkt. 30-5 at ¶ 36). Plaintiff did not suffer any burns or other visible injuries. (Dkt. 30-2 at 80:17-18; Dkt. 30-3 at 42; Dkt. 30-5 at ¶ 37). Lewis, a clinical physician employed by DOCCS, evaluated Plaintiff and recorded that Plaintiff's EKG and examination were normal, with no shortness of breath, chest pain, or murmurs, and his heart was regular. (Dkt. 30-2 at 140:3-10, 142:18-143:1-6; Dkt. 30-5 at ¶ 37). The same day, Plaintiff was taken to the emergency department at Medina Memorial Hospital, where he was given another EKG and fluids. (Dkt. 30-5 at ¶¶ 38-39; *see* Dkt. 30-3 at 141-49). Testing revealed that Plaintiff suffered mild muscle breakdown, for which treatment was intravenous fluids and support, and Lewis testified that the condition would go away "rather quickly." (Dkt. 30-2 at 145:11-19; Dkt. 30-5 at ¶ 38). Plaintiff was advised that he could return to his dormitory at Orleans once he was released from the hospital emergency department, also on the same day. (Dkt. 30-5 at ¶ 39).

The day after Plaintiff suffered the shock, he returned to work in the maintenance department, and Smith trained him on basic electricity, including how to connect electrical test leads to a motor, to avoid a similar incident in the future. (Dkt. 30-2 at 86:24-87:1, 87:17-21, 106:24-107:5, 199:4-14).[3]  Plaintiff testified that Smith said Plaintiff should not have used the testing device in question the day before because Cooper made it and it was "Jimmy rigged." (*Id.* at 87:10-17).  Plaintiff further testified that Smith took out a "regular" testing device and informed Plaintiff that he should have been using that device instead. (*Id.*; *see also* Dkt. 30-2 at 33-34).  Plaintiff testified that the testing device that Cooper gave him was missing the plastic coating normally placed on each electrical lead to protect against electrocution. (Dkt. 30-2 at 76:22-78:16, 80:21-82:8; *see* Dkt. 30-3 at 302-04).

Smith denied telling Plaintiff that Plaintiff should not have been using the testing device that Cooper allegedly made. (Dkt. 30-2 at 199:15-21, 201:11-14).  Cooper testified that the testing device that Plaintiff used contained plastic coating on the electrical leads and denied that the testing device was "Jimmy rigged" because it was "specially made for that purpose." (*Id.* at 122:13-123:7; Dkt. 30-5 at ¶ 16).  Cooper asserted that the maintenance department's testing devices were safe and that he had been using them for a

---

[3]    In the amended complaint and during the Court of Claims trial, Plaintiff asserted that officials at Orleans, including Smith, attempted to make him sign paperwork after he was shocked to record that Plaintiff had been trained on how to properly test a fan motor. (*See* Dkt. 9 at 7; Dkt. 30-2 at 104:8-106:23).  Plaintiff refused to sign because he believed that the officials were attempting to protect themselves against a possible lawsuit, since Plaintiff had filed a "notice of intent," presumably a reference to filing a Notice of Claim, which is required when suing New York State in the Court of Claims. (Dkt. 30-2 at 105:17-106:16; *see* Dkt. 9 at 7).  *See* Court of Claims Act § 10(3).  During the trial, the State stipulated to the fact that Plaintiff was trained on the day after the incident, which the court found resolved the paperwork issue. (Dkt. 30-2 at 106:24-107:9).

long time.  (Dkt. 30-2 at 125:15-19; Dkt. 30-5 at ¶ 18).  Smith testified that he "assumed" that Plaintiff was given a testing device that had plastic coating on the electrical leads but acknowledged that he was not in the room when Plaintiff was shocked.  (*See* Dkt. 30-2 at 189:5-13; Dkt. 30-5 at ¶¶ 26-27).

One week after he suffered the electrical shock, on December 11, 2019, Plaintiff had a follow-up visit with Lewis.  (Dkt. 30-5 at ¶ 39).  Plaintiff reported numbness in his hands, legs, and feet.  (*Id.*).  Lewis told Plaintiff that he did not need an MRI or other additional testing after the shock because he had not suffered cardiac issues or loss of consciousness.  (*Id.* at ¶ 40).  Plaintiff testified that it took him "over a week or two to finally see Mr. Lewis" for the follow-up visit and that he had submitted multiple requests before securing the appointment.  (*See* Dkt. 30-2 at 109:8-18).  Plaintiff alleges that Cook told him to "stop being a pussy" and that his requests for medical attention were being thrown out.  (Dkt. 9 at 8, 52).

Plaintiff filed a grievance on January 17, 2020, alleging that he had tingling and numbness in his arms, legs, and feet, and was not being provided proper medical attention, including an MRI and an appointment with a specialist.  (Dkt. 30-3 at 317).  The Inmate Grievance Resolution Committee (IGRC) denied the grievance, noting that Plaintiff had been evaluated on December 11, 2019, and that he was advised that an MRI was unnecessary.  (*Id.* at 318).  Plaintiff's appeal of the IGRC's response was also denied.  (*Id.* at 321).  DOCCS' Central Office Review Committee held a hearing on April 29, 2020, regarding Plaintiff's grievance and noted that according to DOCCS' Division of Health

Services, Plaintiff was receiving "appropriate treatment" and that an MRI and consultation with a specialist were not medically necessary.  (Dkt. 9 at 29).

On March 22, 2021, Lewis evaluated Plaintiff, who complained of numbness and tingling in his hands, fingers, feet and legs for the past two years.  (Dkt. 30-5 at ¶ 42). Plaintiff believed his symptoms resulted from the electrical shock, and Lewis ordered x-rays and a nerve conduction study.  (*Id.*).  The x-rays of Plaintiff's chest and cervical spine were normal.  (Dkt. 30-3 at 106-07).  After scheduling delays due to the COVID-19 pandemic, Plaintiff underwent the nerve conduction study on July 9, 2021.  (Dkt. 30-5 at ¶ 43).  The study indicated that Plaintiff had not suffered any nerve issues to his upper extremities from electrocution.  (Dkt. 30-2 at 153:16-154:2; *see* Dkt. 30-3 at 108-09). Plaintiff was advised to come back for a nerve conduction test of his lower extremities, but he refused to have additional tests done.  (Dkt. 30-2 at 154:6-12; *see* Dkt. 30-3 at 115).

Plaintiff filed two claims against the State of New York in 2020 in the Court of Claims, based on the same series of events, and the Court of Claims consolidated the cases. (Dkt. 30-2 at 2-66; Dkt. 30-5 at ¶¶ 5-8).  Plaintiff brought a negligence claim, alleging that Cooper improperly instructed him on how to test a fan motor, causing Plaintiff to suffer the electrical shock.  (Dkt. 30-2 at 2, 14; Dkt. 30-5 at ¶ 9).  Plaintiff also asserted a medical negligence claim, alleging that Orleans officials denied him proper treatment after the incident.  (Dkt. 30-2 at 24; Dkt. 30-5 at ¶ 9).  Judge Martin held a trial on Plaintiff's

consolidated claims on May 25, 2023, and issued her decision from the bench.  (Dkt. 30-5 at ¶ 11; *see also* Dkt. 30-2 at 204:18-205:18; Dkt. 30-4 at 7).[4]

The Court of Claims found that Plaintiff was not properly instructed on how to use the testing device and that Cooper was negligent in not verifying the location of Plaintiff's hands before turning on the power to the device, causing Plaintiff to be shocked.  (Dkt. 30-2 at 204:18-205:1).   Judge Martin also found that there was no documentation of any injuries to Plaintiff, that Plaintiff's subjective complaints about the numbness and other symptoms he experienced were "not consistent," and that Plaintiff failed to prove a correlation between the shock he suffered and his symptoms because he did not submit expert testimony.  (*Id.* at 205:3-14).  Plaintiff was awarded $75.00 plus $0.62 in interest for his experience at the time of the shock, including the sensations he felt for a period of seconds, falling down, and being startled, as well as any filing fee he paid.  (*Id.* at 205:14-18; Dkt. 30-4 at 7).

## PROCEDURAL BACKGROUND

Plaintiff filed his initial complaint on March 1, 2021.  (Dkt. 1).[5]  Upon screening pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, the Court entered an Order dismissing the claims against the State of New York, DOCCS, and the individual Defendants in their

---

[4]     Plaintiff had also filed an unrelated Court of Claims action, regarding a separate medical issue, and the Court of Claims held a trial on that action on the same day as the trial about the incident involving the electrical shock.  (Dkt. 30-5 at ¶ 12).

[5]     Plaintiff also filed a document that he identified as "Amended Claims."  (Dkt. 7). In its first screening order, the Court treated the filing, which briefly reiterated Plaintiff's allegations, as a supplemental to the complaint, which remained the operative pleading at the time.  (Dkt. 8 at 1).

official capacities with prejudice and dismissing the claims against Lewis, Beck, and "other nurses (Jane Does)," with leave to amend.  (Dkt. 8).  Plaintiff was allowed to proceed to service on the claim under the Eighth Amendment for failure to protect against Smith and Cooper.  (*Id.* at 6).

Plaintiff filed an amended complaint on August 25, 2021.  (Dkt. 9).  On May 2, 2022, the Court issued a screening order, allowing Plaintiff to proceed to service on the claim under the Eighth Amendment for deliberate indifference to serious medical needs against Lewis, Beck, and Cook.  (Dkt. 11).

Smith, Cooper, Beck, and Cook answered the complaint on August 1, 2022.  (Dkt. 15).  After the summons for Lewis was returned unexecuted (Dkt. 12), Magistrate Judge Marian W. Payson entered a Valentin order, to which the New York Attorney General's Office responded.  (Dkt. 17; Dkt. 19).  Lewis answered the complaint on December 12, 2022.  (Dkt. 21).

On November 10, 2023, Defendants filed a motion for summary judgment.  (Dkt. 30).  Plaintiff was ordered to file a response by December 18, 2023 (Dkt. 31), but failed to do so.

## DISCUSSION

### I.   Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact . . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted).

Rule 56 also provides that if a non-moving party fails to oppose a summary judgment motion, the court may grant summary judgment "if the motion and supporting materials . . . show that the movant is entitled to it[.]"  Fed. R. Civ. P. 56(e).  "[W]here the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'"  *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir.

2001)).  If the evidence submitted in support of the motion for summary judgment does not meet the movant's burden of production, "summary judgment must be denied even if no opposing evidentiary matter is presented."  *Amaker*, 274 F.3d at 681.  In deciding whether the moving party has met its burden, "the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Local Rule 56] statement.  It must be satisfied that the citation to evidence in the record supports the assertion."  *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014).

"The Court of Appeals for the Second Circuit has held that when a party moves for summary judgment against a *pro se* litigant, either the movant or the district court must provide the *pro se* litigant with notice of the consequences of failing to respond to the motion."  *Moran v. Livingston*, 155 F. Supp. 3d 278, 284 (W.D.N.Y. 2016) (quoting *Gustin v. Potter,* 474 F. Supp. 2d 460, 462 (W.D.N.Y. 2007)); *see Irby v. N.Y.C. Transit Auth.,* 262 F.3d 412, 413 (2d Cir. 2001).  However, even where such notice has been given, "failure to oppose or respond to a motion for summary judgment standing alone does not warrant granting the motion: 'the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.'"  *Devers v. Goord,* No. 06–CV–843S, 2014 WL 4923284, at *4 (W.D.N.Y. Sept. 30, 2014) (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 244).

## II.    <u>Res Judicata</u>

Defendants argue that they are entitled to summary judgment because Plaintiff already had an opportunity to litigate his claims in the Court of Claims.  (Dkt. 30-6 at 9-

14).  "[T]he doctrine of *res judicata*, or claim preclusion, provides that [a] final judgment on the merits of an action precludes the parties . . . from relitigating issues that were or could have been raised in that action."  *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) (alterations in original and quotation omitted).  The doctrine "evokes the common law principles of judicial economy and comity."  *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 279 (2d Cir. 2008).  "To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same."  *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017).  "A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."  *N.Y. v. Mountain Tobacco Co.*, 942 F.3d 536, 543 (2d Cir. 2019); *see Grinols v. Beers*, 532 F. Supp. 3d 95, 103 (W.D.N.Y. 2021) ("New York law governs the preclusive effect of a judgment from a New York state court, and there is 'no significant difference' between New York preclusion law and federal preclusion law.") (internal citations omitted).

"However, a later claim arising from the same nucleus of facts as a previously adjudicated claim is not barred if the initial forum lacked the power to grant the full measure of relief sought in the later litigation."  *Pack v. Artuz*, 348 F. Supp. 2d 63, 69 (S.D.N.Y. 2004) (citing *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 265 (2d Cir. 1997) and *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)); *see Barrington v. N.Y.*, 806 F. Supp. 2d 730, 739 (S.D.N.Y. 2011) (Plaintiff's claim is not barred under res judicata

if "'formal jurisdictional or statutory barriers' prevented him from 'presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law.'") (quoting *Jacobson*, 111 F.3d at 265). "For that reason, courts in this Circuit have held that a suit in a forum where state employees may only be sued in their official capacities does not bar an action against those employees in their individual capacities." *Barrington*, 806 F. Supp. 2d at 739 (citing *Gargiul v. Tompkins,* 790 F.2d 265, 272-73 (2d Cir. 1986) and collecting cases). More specifically, it is well-established that a plaintiff is not precluded from pursuing a § 1983 claim against state employees in their individual capacities when the plaintiff previously litigated a claim in the Court of Claims. *See*, *e.g.*, *Grinols*, 532 F. Supp. 3d at 103 ("The case law is uniform that res judicata does not apply to Court of Claims decisions in later lawsuits against individual state employees."); *Ceara v. Gilboy*, No. 13-CV-6673-FPG, 2018 WL 4691043, at *2 (W.D.N.Y. Sept. 28, 2018) ("Since the Court of Claims does not have jurisdiction to hear claims against state officials in their individual capacities, courts have held that res judicata does not bar a later suit asserting claims against individuals.") (collecting cases); *Pack*, 348 F. Supp. 2d 63, 69 ("[T]he Court of Claims does not have the power to grant the 'full measure of relief' sought in cases, such as the current one, where the plaintiff seeks to recover against state officials in their individual capacities.").

Defendants cite *Livingston v. Goord*, 225 F. Supp. 2d 321 (W.D.N.Y. 2002), *aff'd in part*, *vacated in part on other grounds*, *sub nom. Livingston v. Piskor*, 153 F. App'x 769 (2d Cir. 2005), to support their argument that Plaintiff's claims are precluded by the prior Court of Claims action. (Dkt. 30-6 at 9-11). Defendants also cite *Livingston* and *Ramsey*

*v. Busch*, 19 F. Supp. 2d 73 (W.D.N.Y. 1998), when asserting that the availability of punitive damages in the instant action—a remedy unavailable to Plaintiff in the Court of Claims—still does not allow Plaintiff to relitigate his claims in federal court. (*Id.* at 14). Those cases are not binding on this Court, which finds the conclusions and reasoning of the more recent cases cited above to be more persuasive.[6]  In the Court of Claims, Plaintiff could not bring his Eighth Amendment claims against named state officials in their individual capacities.  Accordingly, res judicata does not apply and does not preclude Plaintiff's § 1983 action against Defendants.

### III.  Collateral Estoppel

Defendants argue that collateral estoppel prevents Plaintiff from relitigating factual issues adjudicated in the Court of Claims action.  (Dkt. 30-6 at 11-12).  "Under the doctrine of collateral estoppel, when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  *Sec. & Exch. Comm'n v. LaGuardia*, 679 F. Supp. 3d 34, 39 (S.D.N.Y. 2023) (quoting *United States v. United States Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir. 2002)); *see also Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002) ("Collateral estoppel, or issue preclusion, prevents parties or

---

[6]      Defendants also cite *Gagne v. Kaczor*, No. 12-CV-545, 2015 WL 6829681, at *5 (W.D.N.Y. Nov. 6, 2015), for the proposition that New York's rule against "claim splitting" bars Plaintiff's claims. (Dkt. 30-6 at 11).  However, that case is distinguishable because the final judgment in the prior action was a stipulation and settlement that discharged DOCCS, the correctional facility, and the facility's employees from future claims arising from the same facts. *See Gagne*, 2015 WL 6829681, at *5-6.  Here, there is no prior settlement between the parties under which Plaintiff released Defendants from any future claims.

their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding.").  Under New York law, "collateral estoppel has two essential elements.  'First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.'"  *Jenkins v. City of N.Y.*, 478 F.3d 76, 85 (2d Cir. 2007) (quoting *Juan C. v. Cortines,* 89 N.Y.2d 659, 667 (1997) (internal citation and quotation marks omitted)).  District courts "must accept the factual findings of the Court of Claims, if those findings were necessarily and actually decided and plaintiff had a full and fair opportunity to litigate the underlying issues."  *Grinols*, 532 F. Supp. 3d at 103 (citation omitted).  "It is well-settled that collateral estoppel may bar a plaintiff from bringing an action in federal court pursuant to 42 U.S.C. § 1983."  *Casler v. W. Irondequoit Sch. Dist.*, 563 F. Supp. 3d 60, 66 (W.D.N.Y. 2021) (quoting *Shell v. Brun*, 362 F. Supp. 2d 398, 400 (W.D.N.Y. 2005)).

In the prior Court of Claims action, Judge Martin found that Plaintiff was not properly instructed about how to use the testing device, including that he should not hold the metal clips when the device was powered.  (Dkt. 30-2 at 204:18-22).  Judge Martin further found that Cooper assumed but did not confirm whether Plaintiff's hands were in the correct location on the testing device, that Plaintiff experienced an electrical shock, and that Plaintiff felt electricity go through his body and fell down.  (*Id.* at 204:23-205:3).  Finally, Judge Martin found that Plaintiff failed to demonstrate any "shock related injuries" and that the extent of what he experienced were "the feelings at the time of the shock for a few seconds and then falling down . . . ."  (*Id.* at 205:10-16).  These factual findings by the

Court of Claims were necessarily and actually decided in order to resolve Plaintiff's negligence claims.

The question then becomes whether Plaintiff had a full and fair opportunity to litigate his case in the Court of Claims. "This prong of the collateral estoppel analysis requires a showing that the plaintiff 'was fully able to raise the same factual or legal issues' in the prior litigation as those asserted in the present case." *Cerny v. Rayburn*, 972 F. Supp. 2d 308, 319 (E.D.N.Y. 2013) (quoting *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002)). In making this determination, courts consider multiple factors, including:

> the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Ceara*, 2018 WL 4691043, at *4 (quoting *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 501 (1984)). Plaintiff's prior action in the Court of Claims, a state court, was based on the same body of facts and evidence as the instant proceeding. While Plaintiff was *pro se* before the Court of Claims, he had the incentive and initiative to litigate his claims, as evidenced by the complaint and amended complaint he filed in that case with supporting exhibits, including personal statements, grievance complaints and appeals, requests for medical treatment, and medical records. (*See* Dkt. 30-2 at 14-63). Plaintiff participated in his trial at the Court of Claims, during which he testified and questioned Cooper, Smith, and Lewis. (*See generally id.* at 68-207). Judge Martin asked Plaintiff numerous questions throughout the trial to develop his testimony and offered him opportunities to submit additional testimony and evidence. (*See id.* at 80:21-81:2, 85:9-19, 89:24-25, 102:15-18, 203:15-16).

- 17 -

Plaintiff was well-aware of the foreseeability of future litigation at the time of the Court of Claims trial in May 2023, since his complaint and amended complaint in the instant action had already been screened and discovery was ongoing.  In sum, since Plaintiff "was fully able to raise the same factual issues" in the Court of Claims, he is precluded from relitigating the same factual issues, to the extent they are applicable to the instant claims. *See Cerny*, 972 F. Supp. 2d at 319.

## IV.    <u>Plaintiff's Failure to Protect Claim against Smith and Cooper</u>

Defendants argue that even if Plaintiff's claims against Smith and Cooper are not barred by res judicata or collateral estoppel, they are still entitled to summary judgment because the evidence introduced during the Court of Claims trial establishes that Smith and Cooper were not deliberately indifferent to a substantial risk of harm to Plaintiff.  (Dkt. 30-6 at 15-18).

As an initial matter, the Court of Claims' finding that Cooper was negligent by failing to verify the location of Plaintiff's hands before turning on power to the testing device neither precludes nor requires a finding that Cooper violated Plaintiff's Eighth Amendment rights.  *See Bertrand v. Demmon*, No. 9:14-CV-1456 (GTS/DEP), 2017 WL 2303994, at *5-6 (N.D.N.Y. May 26, 2017) ("if Plaintiffs are successful in proving negligence . . . in the State action, they would still need to prove deliberate indifference in order to be successful on their Eighth Amendment claims in this Court") (citing *Farmer v. Brennan*, 511 U.S. 825, 826 (1994)); *cf. Farmer*, 511 U.S. at 836 (agreeing that "deliberate indifference [lays] somewhere between the poles of negligence at one end and purpose or knowledge at the other"); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996)

("[T]o state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.").

Under the Eighth Amendment, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate" is unlawful. *Farmer*, 511 U.S. at 828.

> The test for deliberate indifference is twofold.  First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.  Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent.  The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry.  Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Santos v. Jones*, No. 22-CV-6338-EAW, 2023 WL 1109755, at *7 (W.D.N.Y. Jan. 30, 2023) (quoting *Hayes*, 84 F.3d at 620).  An inmate's work conditions in the correctional facility are considered a condition of confinement.  *See Washington v. Artus*, 708 F. App'x 705, 706 (2d Cir. 2017) (analyzing plaintiff's claim that he faced unsafe conditions while working in the prison mess hall under Eighth Amendment's two-part analysis).

The objective component "can be satisfied even where no serious physical injury results," and "the focus of injury must be, not the extent of the physical injuries sustained . . . but rather the existence of a 'substantial risk of serious harm.'" *Mazyck v. Keller*, 531 F. Supp. 3d 630, 642 (W.D.N.Y. 2021) (quoting *Randle v. Alexander*, 960 F. Supp. 2d 457, 473-74 (S.D.N.Y. 2013)); *see Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("[t]o meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," with their severity "evaluated in light of contemporary standards of decency").  The Supreme Court has

recognized that exposed electrical wiring can represent a safety hazard, and other courts have noted the inherent danger of working with electricity when analyzing the objective component. *See Helling v. McKinney*, 509 U.S. 25, 34 (1993); *Gray v. Garman*, No. 4:21-CV-01221, 2022 WL 2392931, at *3 (M.D. Pa. July 1, 2022) ("the risk of electrocution is a sufficiently significant danger"); *McKinney v. Archey*, No. 1:08 CV 112 JM, 2008 WL 3914978, at *3 (N.D. Ind. Aug. 19, 2008) ("Electricity and the means used to conduct it are inherently dangerous . . . [I]t cannot be reasonably disputed that working with electricity presents an objectively serious risk."). Moreover, outside the Second Circuit, courts have concluded that "forcing an inmate to work with faulty electrical equipment or near exposed electrical wiring without appropriate protection can pose a substantial risk of serious harm." *Calhoun v. N.Y.C. Dep't of Corr.*, No. 10 Civ 182(LAK)(HBP), 2014 WL 144659, at *6 (S.D.N.Y. Jan. 14, 2014) (collecting cases); *see Bentz v. Hardy*, 638 F. App'x 535, 536, 538 (7th Cir. 2016) (inmate who suffered minor shocks after touching wall switch exposed to rainwater faced a substantial risk of physical injury); *but see Morisette v. Peters*, 45 F.3d 1119, 1122-23 (7th Cir. 1995) (no Eighth Amendment violation when plaintiff was shocked on two occasions by exposed wires over his bed and complained of a boil one month later).

Defendants argue that the testing device that Plaintiff used was not faulty and point to Cooper's testimony in the Court of Claims trial that the testing device given to Plaintiff was safe and designed specifically to test fan motors. (Dkt. 30-6 at 17).[7] However,

---

[7] Smith admitted that he was not in the room when Plaintiff was shocked and that he could only "assume" that the testing device Plaintiff used was the same as the photo of the

Plaintiff testified that the testing device was missing protective plastic coating on the electrical leads and that Smith told him that it was "Jimmy rigged." (Dkt. 30-2 at 76:20-78:16, 80:21-82:8, 87:10-17). The Court of Claims made no findings as to the quality or condition of the testing device that Plaintiff was given on the day he suffered the shock. Therefore, there is a question of material fact as to whether the testing device was faulty or unsafe for Plaintiff's use, such that it created a substantial risk of harm to Plaintiff.

"[F]ailure to train inmates for their work duty and use of unsafe equipment sounds in an Eighth Amendment violation for unsafe prison conditions[.]" *James v. Westchester Cnty.*, No. 13-cv-0019 (NSR), 2014 WL 4097635, at *4 (S.D.N.Y. Aug. 19, 2014); *cf. Buckely v. Barbour Cnty, Ala.,* 624 F. Supp. 2d 1335, 1345 (M.D. Ala. 2008) (inmates' use of chainsaws without training created a substantial risk of harm). Defendants contend that Cooper and Smith were not deliberately indifferent because Cooper "explained the testing process to [Plaintiff]" and how to attach the device to the fan motor. (Dkt. 30-6 at 17). But the Court of Claims found that Plaintiff was not appropriately trained on how to safely use the testing device. Plaintiff was employed as a locksmith, and repairing and testing a fan motor were outside of his normal responsibilities. The Court concludes that the failure to train Plaintiff on how to safely use a device that serves as a conductor of electricity objectively poses a substantial risk of serious harm.

Nevertheless, even if Plaintiff faced a constitutionally impermissible risk of harm, Plaintiff cannot meet the subjective component of his Eighth Amendment claim against

---

testing device—which contained protective plastic coating—shown to him during the Court of Claims trial. (*See* Dkt. 30-2 at 189:5-13; Dkt. 30-3 at 301-04).

Cooper and Smith because there is no evidence in the record that Cooper and Smith were deliberately indifferent to the harm that Plaintiff faced.  To establish liability for a failure to protect claim, prison officials "must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  The state of mind requirement is "more than negligence, but less than conduct undertaken for the very purpose of harm." *Id.*  A prison official must "know[] of and disregard[] an excessive risk to inmate health or safety" and "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* (quoting *Farmer*, 511 U.S. at 837).  "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain."  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

Plaintiff testified that the electrical shock was an accident and that Cooper "didn't do it on purpose."  (Dkt. 30-2 at 102:25-103:14, 129:25-130:2).  There is no evidence in the record that Cooper knew that Plaintiff's hands were on the metal clips, and, indeed, Plaintiff testified, "My hands were still on it, *which he didn't realize*."  (*Id.* at 83:1-2 (emphasis added)); *see also id.* at 78:17-24 ("my main argument . . . is like [Cooper] didn't check to look at me to see if my hands were in the right spot . . . He's just flip and then next thing you know, I'm getting shocked . . . .")).  Cooper testified that he thought Plaintiff knew to put his hands on the protective coating on the metal clips, rather than on the clips themselves.  (*Id.* at 131:12-18).  While Plaintiff alleged in the amended complaint that he informed Cooper before the incident that the testing device was held together by duct tape and did not look "right," this general comment is insufficient to raise a genuine dispute of

fact as to whether Cooper drew the inference that Plaintiff faced a substantial risk of harm from the device, especially since Cooper allegedly responded that the device was fine and that Plaintiff should ensure that the electrical leads did not touch. (*See* Dkt. 9 at 6). Plaintiff also does not allege that Cooper was aware that Plaintiff had not been trained on the basics of electricity.

Also relevant to Cooper's state of mind, Plaintiff testified that Cooper was "irritated" and "aggravated" with Plaintiff and the other inmate working on the fan motor at the time of the incident, in part because it had taken them longer than expected to fix the motor. (*See* Dkt. 30-2 at 84:19-24, 103:1-5, 15-21). But even if this was true, this does not establish that Cooper had "knowledge of a significant risk of harm to Plaintiff" or that he disregarded such a risk because Cooper did not know that Plaintiff's hands were in the incorrect position when Cooper engaged the power. *See Farmer*, 511 U.S. at 837; *see also Austin v. Craighead Cnty. Jail*, 189 F. App'x 583, 584 (8th Cir. 2006) (*per curiam*) (affirming dismissal of case after bench trial when testimony established prison official "believed the power to the wires had been cut off, and [plaintiff] did not show that defendants actually knew of and disregarded, or were deliberately indifferent to, a risk to his safety"). Accordingly, Plaintiff cannot demonstrate that Cooper was deliberately indifferent, and the Court grants summary judgment to Defendants on the claim against Cooper.

As to Plaintiff's claim against Smith, Plaintiff alleges that Smith "provided" the purported faulty testing device that Plaintiff was using when he suffered an electrical shock. (Dkt. 9 at 6). Plaintiff also seemingly asserts a claim of supervisory liability against

Smith based on Cooper's alleged constitutional violation.  (*See id.*).  "[T]here is no special rule for supervisory liability," and "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotations and citations omitted).   In other words, "[t]he violation must be established against the supervisory official directly."  *Id.*  Plaintiff does not allege nor is there evidence in the record that Smith was aware that Plaintiff may have been using a substandard testing device or that Plaintiff had not been properly tested on how to use the testing device <u>before</u> he suffered the electrical shock.  Smith was in his office, in a separate room, during the time in which Plaintiff and the other inmate fixed the fan motor, Plaintiff connected the motor to the testing device, and Cooper turned on the power to the testing device.  (Dkt. 30-2 at 75:10-15).  Since Smith was not physically present for these events, he lacks the requisite personal involvement for a constitutional violation.   Accordingly, Plaintiff cannot demonstrate that Smith was deliberately indifferent, and the Court grants summary judgment to Defendants on the claim against Smith.

## V.   <u>Failure to Provide Medical Care Claim against Lewis, Beck, and Cook</u>

Defendants argue that Plaintiff is collaterally estopped from litigating the fact that he did not suffer any injuries from the electrical shock, aside from what he experienced at the time of the shock itself.  (Dkt. 30-6 at 11).  In addition, even if Plaintiff's claims against Lewis, Beck, and Cook are not barred by res judicata or collateral estoppel, Defendants contend they are still entitled to summary judgment because the evidence introduced during

the Court of Claims trial establishes that Lewis, Beck, and Cook were not deliberately indifferent to Plaintiff's medical needs.  (*Id.* at 18-19).

An Eighth Amendment claim arising out of inadequate medical care requires a plaintiff-inmate to demonstrate that a defendant was deliberately indifferent to a serious medical need.  *Estelle*, 429 U.S. at 104.  A claim for deliberate indifference has both an objective and a subjective component.  *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991). Objectively, a medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway*, 37 F.3d at 66).  "Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the 'equivalent of criminal recklessness.'"  *Lapierre v. Cnty. of Nassau*, 459 F. App'x 28, 29 (2d Cir. 2012) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

The Court of Claims did not make any findings against New York State regarding Plaintiff's alleged insufficient medical treatment after he suffered the electrical shock. Judge Martin found:

> [T]here doesn't appear to be any documentation of any injuries.  The subjective complaints of numbness [] were not consistent and not clarified as to what the level of symptoms were or how these symptoms interfered in any way with his activities.  In other words, there was not a good description of anything beyond the shock itself as to what any of the [] symptoms were. Electrical studies, tests did not prove there was any shock related injuries. Expert testimony would have been required to prove a correlation between the shock and any symptoms, and that was not presented.

(Dkt. 30-2 at 205:3-14).  The Court of Claims' finding that Plaintiff did not demonstrate any injuries caused by the electrical shock, aside from what he experienced for several

seconds at the time of the incident, can only lead this Court to conclude that Plaintiff did not suffer from an objectively serious medical need. Plaintiff also is barred from litigating whether Lewis, Beck, and Cook were deliberately indifferent to Plaintiff's serious medical needs because the Court of Claims did not find that state medical officials were negligent or otherwise provided insufficient medical care, despite Plaintiff's claims to the contrary. "In deciding that there was nothing in the record to demonstrate negligence by plaintiff's medical providers, let alone evidence from a medical expert to suggest that plaintiff's medical providers failed to meet the appropriate standard of care, the Court of Claims resolved the factual issues" relevant to this claim. *Gathers v. Tan*, No. 10-CV-0475S(Sr), 2014 WL 12648666, at *8 (W.D.N.Y. Aug. 21, 2014) (collecting cases and internal alterations omitted), *subsequently aff'd on other grounds*, 619 F. App'x 19 (2d Cir. 2015). Accordingly, collateral estoppel applies as to Plaintiff's claims against Lewis, Beck, and Cook, and Defendants are entitled to summary judgment on this basis.

Even if Plaintiff was not estopped from arguing that he had a serious medical need, the evidence does not raise a genuine issue of material fact as to this issue. Plaintiff alleges that after suffering the electrical shock, he had "extreme pain and internal ailments," including numbness and tingling in his extremities. (Dkt. 9 at 8). "[S]ubjective complaints of pain are not sufficient to satisfy [the serious medical need] standard," nor are complaints of numbness or tingling. *Martinez v. Aycock-West*, 164 F. Supp. 3d 502, 512 (S.D.N.Y. 2016) (quoting *Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003)); *see Dallio v. Hebert*, 678 F. Supp. 2d 35, 60 (N.D.N.Y. 2009) (numbness in hands and fingers not a serious medical need). Plaintiff has not identified specific medical

outcomes that he suffered from the alleged denial of medical care, nor has he alleged that he was unable to engage in normal daily activities due to his symptoms.  *See Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) ("[T]he actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm."); *Chance*, 143 F.3d at 703-04 (plaintiff's inability to participate in normal activities is a relevant factor in considering whether a serious medical need exists).  The Court therefore concludes that Plaintiff did not suffer from a serious medical need.

As to the subjective requirement for a failure to provide medical care claim, Plaintiff cannot establish that Lewis, Beck, and Cook were deliberately indifferent to his medical needs.  An official must know of and disregard an excessive risk to inmate health or safety and "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and "must also draw the inference."  *Id.* at 702 (quoting *Farmer*, 511 U.S. at 837).  Lewis' testimony in the Court of Claims establishes that he did not know of facts nor draw the inference that a substantial risk of serious harm to Plaintiff existed. Lewis evaluated Plaintiff on the day that he was shocked and concluded that Plaintiff's physical examination was normal.  (Dkt. 30-5 at ¶ 37).  At a follow-up appointment one week later, Lewis informed Plaintiff that he did not need additional testing because he had not suffered cardiac issues or loss of consciousness.  (*Id.* at ¶ 40).  Plaintiff alleges that Beck said that "in her opinion, [plaintiff's] pain isn't that bad[,]" and that Lewis and Cook ignored Plaintiff's requests for an MRI and to be seen by a specialist.  (Dkt. 9 at 8-9).  "It is well-established that mere disagreement over the proper treatment does not create a

constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.  Approximately fifteen months after Plaintiff experienced the shock and in response to Plaintiff's complaints of pain, Lewis ordered x-rays and a nerve conduction study.  (Dkt. 30-5 at ¶¶ 42-43).  In sum, the record demonstrates that Plaintiff was evaluated in response to his requests for medical care, and no reasonable factfinder could find that Lewis, Beck, or Cook were deliberately indifferent to Plaintiff's medical needs.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. 30) is granted.  The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: July 31, 2024
       Rochester, New York

- 28 -